IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| HARRIS N.A., | ) | |
| | ) | |
| Plaintiff, | ) | No. 09 C 6661 |
| v. | ) | |
| | ) | Judge Robert W. Gettleman |
| ACADIA INVESTMENTS L.C. and LOREN W. HERSHEY,, | ) ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff, Harris N.A. ("Harris"), a national banking association, sued defendant Acadia Investments L.C. ("Acadia"), a Virginia limited liability company, and defendant Loren W. Hershey ("Hershey"), its principal officer, seeking judgment for default of a $15.5 million note and a personal guaranty. Count I of the complaint alleges that Acadia defaulted on the note. Count II alleges that Hershey breached a personal guaranty on that note. Plaintiff has moved for summary judgment. For the reasons stated below, that motion is granted in part and denied in part.

**BACKGROUND**

Acadia is a limited liability company that mostly consists of the Hershey family: defendant Loren Hershey, his wife, and his three adult children. Three trusts – one charitable trust and two family trusts – constitute the rest of Acadia's membership.

In 2007, a division of Harris known as HarrismyCFO and Acadia began discussing a possible lending arrangement.[1] HarrismyCFO primarily markets its investment-management

---

[1] The parties dispute whether Harris or Acadia initiated the credit relationship. This dispute is immaterial to the issues raised in plaintiff's motion for summary judgment.

services to family-owned businesses and wealthy families. Following discussions between Acadia and HarrismyCFO, they agreed to begin a lending arrangement between Harris and Acadia, with HarrismyCFO serving as manager of the lending relationship.

In February 2008, Acadia and Harris entered a Credit Agreement, whereby Harris agreed to lend up to $12.5 million to Acadia on a revolving basis. The $12.5 million debt was scheduled to mature on January 31, 2011. The Credit Agreement afforded plaintiff the right, however, to accelerate the full amount of principal and interest due upon any "Event of Default." One such "Event of Default" was defined as the failure to reduce the principal balance below 35% of the value of Acadia's investments by March 31, June 30, September 30, and December 31 of each year. The Credit Agreement also provided that interest would be calculated at a "Base Rate," but that Acadia had the option to request certain portions of the interest to be calculated at the London Interbank Offered Rate ("LIBOR"). In conjunction with the Credit Agreement, Acadia executed a $12.5 million promissory note to Harris ("First Note"), and Hershey executed a personal guaranty on Acadia's indebtedness.

Acadia planned to use this line of credit primarily to purchase limited partnership interests in other private equity funds, hedge funds, and real estate funds.[2] Acadia used the income from its investments to reinvest, distributing the balance to its members for their living expenses and, in the case of the charitable trust, for philanthropic activities. Aside from these distributions, defendant Hershey contributed his services to Acadia without compensation.

Shortly after Acadia executed the First Note, defendants, through Hershey, began to express interest in exercising its option to have a portion of the interest calculated at the LIBOR

---

[2]Acadia also planned to use the loan proceeds to pay off a previous loan.

rate. Thus, Hershey contacted one of plaintiff's representatives and asked him for a quote as for the LIBOR rate at both one- and two-year intervals. Thereafter, plaintiff applied the LIBOR rate for one year of interest. Hershey contacted plaintiff and told it that this was an error by plaintiff's representative; he wanted the LIBOR rate to be applied only to a six-month period. Plaintiff and defendants never resolved the dispute.

On August 18, 2008, plaintiff and defendants entered into the First Amendment to the Credit Agreement ("First Amendment"). The First Amendment provided for a $3 million advance to defendants, and required Acadia to execute another promissory note ("Second Note") for $15.5 million. The Second Note provided that it was "in replacement and substitution for" the First Note, but was "issued by [defendant] under the terms and provisions of the Credit Agreement . . . ." Hershey also executed a second guaranty, personally guaranteeing Acadia's indebtedness under the Second Note.

In October 2008, plaintiff and defendant began to discuss Acadia's ability to make payments on the Second Note in light of the spreading financial crisis. No agreements resulted from these discussions, however.[3] By February 1, 2009, defendants had failed to reduce the amount of principal below 35% of the value of its assets as required by the Credit Agreement.

In light of this event of default, on May 12, 2009, plaintiff and defendants executed a "Forbearance Agreement and Second Amendment to Credit Agreement" ("Forbearance Agreement"). Under the Forbearance Agreement, plaintiff agreed to forbear from exercising its

---

[3]Defendant contends that plaintiff suggested extending the maturity date on the Second Note by a year or two and increasing the loan amount to $17.5 million. Plaintiff does not contest this fact, but asserts that it informed Hershey that any increase in the loan amount or extension would require approval from plaintiff's "Concurrence Area."

3

rights accrued by reason of defendants' defaults until August 6, 2009. In return, defendants were required to make the $3 million principal reduction outlined in the Credit Agreement before that date. The Forbearance Agreement contained a provision purporting to waive all of defendants' defenses, except those arising out of the pending dispute over whether the LIBOR interest rate should be applied to a six-month or one-year period.

During the discussions over the terms of the Forbearance Agreement, defendants sought assurance from plaintiff that it would assist defendants in selling some of Acadia's assets to make the required payments. Defendants offer evidence, which plaintiff does not contest, of a HarrismyCFO employee reassuring Hershey that plaintiff would work with him in such a sale. The Forbearance Agreement's terms, however, place no obligation on plaintiff to participate in such a sale. Defendants further contend that plaintiff never assisted with this sale.

Instead, plaintiff served defendants with a Notice of Default on August 11, 2009. In response, defendants tendered interest payments to plaintiff reflecting payments due in May, July, and August 2009. Plaintiff responded to these payments with a letter stating that it would accept the payments so long as defendant would forfeit any claim to an improper interest calculation, and plaintiff could retain its rights obtained by the expiration of the Forbearance Agreement. By September 11, 2009, defendants did not respond to this offer and plaintiff sent defendants a letter demanding that all interest payments be made by September 25, 2009.

## **DISCUSSION**

Under Fed. R. Civ. P. 56(c)(2), summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." The initial

burden is on the moving party to demonstrate the absence of issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party can do so, the burden shifts to the non-moving party to "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). In deciding a motion for summary judgment, the court construes all facts in a light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Defendants do not contest that they have made no payments on the note, or that defendant Hershey personally guaranteed all of the indebtedness. Therefore, plaintiff is entitled to summary judgment unless defendants raise a question of material fact as to any of its nine affirmative defenses: 1) that the principal amount of the note is not due; 2) estoppel; 3) mutual mistake of fact; 4) violations of the duties of good faith and fair dealing and commercial reasonableness for coercing defendants into the Forbearance Agreement and rejecting interest payments made by defendants; 5) economic duress; 6) violation of the duty of good faith and fair dealing for failing to participate in the sale of Acadia's assets; 7) improper calculation of interest owed; 8) setoff and offset; and 9) recoupment. For the reasons stated below, defendants do not create a genuine issue of material fact as to their liability under the Second Note.

First, plaintiff argues correctly that the Illinois Credit Agreement Act (ICAA), 815 ILCS 160/1 *et seq.*, bars defendants' second, fourth, fifth, and sixth affirmative defenses because those defenses are premised on oral agreements modifying the written agreements. The ICAA provides, "A debtor may not maintain an action on . . . a credit agreement unless the credit agreement is in writing, expresses an agreement or commitment to lend money or extend credit or delay or forbear repayment of money, and is signed by the creditor and debtor." 815 ILCS

5

160/2. The Seventh Circuit has described the ICAA as a "strong form" of the Statute of Frauds, requiring a writing signed by both parties. *Resolution Trust Corp. v. Thompson*, 989 F.2d 942, 944 (7th Cir. 1993). The Act defines "credit agreement" as "an agreement or commitment by a creditor to lend money or extend credit or delay or forbear repayment of money not primarily for personal, family, or household purposes . . . ." 815 ILCS 160/1(1).

Defendants assert that these loans were primarily for family, household, or personal use, and thus not covered by the ICAA. Defendants note that HarrismyCFO is an entity that tailors primarily to family-owned businesses, that the Hershey family comprises most of Acadia's membership, and that Acadia's distributions were used primarily to pay the living and personal expenses of the Hersheys, including the purchase of a horse farm.

Scant legislative history exists on the ICAA. In fact, in interpreting the Act the Seventh Circuit stated, "[T]he [ICAA] . . . has no usable legislative history; nor can we find parallel statutes in other states." *Resolution Trust*, 989 F.2d at 944. The plain language of the statute, however, suggests that the credit in question falls within the ICAA's reach because the definition of "credit agreement" focuses on whether the loan is for "personal, family, or household purposes." 815 ILCS 160/1.

Little interpretation of the phrase "personal, family, or household purposes" exists in regard to the ICAA. In *Whirlpool Financial Corp. v. Sevaux*, 874 F. Supp. 181, 186-87 (N.D. Ill. 1994), *aff'd* 96 F.3d 216 (7th Cir. 1996), the court rejected the defendant's argument that personally securing a loan made that loan "for personal, family, or household purposes." In that case, the defendant obtained a loan for his oil rig manufacturing business, but personally guaranteed the indebtedness. *Id.* at 183. The court looked to the purpose of the loan rather than

6

the guaranty, finding that it was commercial because of both the explicit language of the promissory note in question and the use of the proceeds to shore up the defendant's business. *Id.* at 187.

In the instant case, the purpose of the loan between plaintiff and defendants was commercial. Defendants do not argue that Hershey's personal guaranty, or any other security, affected the nature of the loan. Rather, defendants argue that this loan was for the personal, family, and household use of the Hershey family. Defendants concede, however, that the loan was designed so that Acadia could invest in other private equity funds, refinance its outstanding business debts, and pay off another loan. That the members of Acadia received distributions from the company to fund their living expenses and horse farm purchase does not speak to the purpose of the loan. Since the ICAA provision in question concerns the definition of the term "credit agreement," the purpose of the loan must be assessed rather than the purpose of Acadia's distributions to its members.

Defendants also argue that because HarrismyCFO, the division of Harris with which Hershey made the initial credit arrangement, dealt primarily with wealthy families' assets, this loan should be characterized as "for personal, family, or household purposes." Again, the court finds defendants' argument unavailing. The nature of the creditor's business does not bear on the purpose of the loan in question. Whether HarrismyCFO usually made loans for personal, family, or household purposes is irrelevant for purposes of this motion; rather, the court must examine the commercial uses to which the loan proceeds were meant to be put. Therefore, the credit arrangement between Harris and Acadia was not "for personal, family, or household purposes," and the ICAA applies to this credit arrangement.

Because the ICAA applies to the instant action, any of defendants' affirmative defenses that rely on the existence of an oral agreement are barred. *See Westinghouse Elec. Corp. v. McLean*, 938 F. Supp. 487, 490 (N.D. Ill. 1996) (stating that the ICAA "uniformly bar[s] the claims and defenses of debtors which have relied on the existence of oral credit agreements"). The ICAA has been interpreted to reach beyond the coverage of the traditional Statute of Frauds, barring any action that "is in any way related to a credit agreement." *Whirlpool Financial Corp. v. Sevaux*, 96 F.3d 216, 226 (7th Cir. 1996). In the instant case, defendants' affirmative defenses of equitable estoppel, economic duress, and violations of the duties of good faith and fair dealing and commercial reasonableness all rest on the assertion that plaintiff promised to assist defendants in the sale of some of Acadia's assets and then broke that promise. Therefore, these defenses rest on oral promises made by plaintiff and are barred by the ICAA. Although defendants present emails that tend to show that a Harris employee might have made such a promise, these emails are not signed by both the creditor and debtor as required by the ICAA. *See* 815 ILCS 160/2. Consequently, the ICAA bars defendants' second, fourth, fifth, and sixth affirmative defenses.

Next, defendants argue that the principal amount of the loan is not due and that a mutual mistake of fact occurred as to the due date. Specifically, they argue that they understood that no payments were required until the Second Note reached the "Maturity Date," defined in the Credit Agreement as January 31, 2011. Plaintiff contends that the Forbearance Agreement signed by defendants recognizes that they were in default, but that plaintiff would forbear from accelerating the principal and interest due until August 6, 2009. Thus, plaintiff argues, it was under no obligation to forbear from accelerating the full amount due under the Second Note.

Section 4 of the Forbearance Agreement provides, "Unless and until a Standstill Termination occurs, the Bank will not accelerate the Obligations or . . . exercise any other rights or remedies available solely by reason of the Subject Defaults." The Forbearance Agreement defines "Standstill Termination" to include the "occurrence of Scheduled Standstill Termination Date": August 6, 2009. Therefore, a Standstill Termination occurred after August 6, 2009, and plaintiff was no longer under any obligation to forbear from exercising the rights created by reason of defendants' Subject Defaults.

The term "Subject Defaults" refers to defendants' failure to make two mandatory reductions in principal under the terms of the Credit Agreement. In the Forbearance Agreement, defendants agreed that they had not made the required mandatory prepayments, and they do not contest this assertion in plaintiff's Local Rule 56.1(a) Statement of Material Facts. Moreover, the Credit Agreement categorizes a failure to make these prepayments as an "Event of Default," which triggers plaintiff's right to "declare the principal and interest on the Note to be . . . due and payable." Therefore, plaintiff had the right to accelerate the payment of the principal and interest of the Second Note because of defendants' failure to make prepayments, and this was a right that plaintiff no longer had to forbear from exercising after August 6, 2009. Consequently, plaintiff is entitled to summary judgment as to defendants' first affirmative defense – that the principal on the Second Note is not due – because the plain language of the agreement between plaintiff and defendants indicates that plaintiff had the right to declare the full amount due.

Similarly, no genuine issue of material fact exists as to defendants' third affirmative defense: mutual mistake of fact. Under Illinois law, mutual mistake of fact, for purposes of reformation of a written agreement, exists "when the contract has been written in terms which

violate the understanding of both parties." *In re Marriage of Miller*, 363 Ill. App. 3d 906, 913 (Ill. App. 4th Dist. 2006) (quoting *In re Marriage of Johnson*, 237 Ill. App. 3d 381, 394 (Ill. App. 4th Dist. 1992)).

In the instant case, defendants present no evidence that would create a genuine issue of material fact showing that both parties were mistaken. Defendants merely argue that Hershey did not understand that failure to pay the prepayment would result in the full loan becoming due. Hershey's interpretation of the contract language does not constitute a mistake that would justify the admission of parol evidence, or the reformation of the contract. *See Lukin v. Lightfoot*, 131 Ill. App. 3d 566, 569 (Ill. App. 5th Dist. 1980) (finding that the trial court did not err in excluding parol evidence of parties' intent because "there was no mutual mistake regarding the contract, . . . the parties simply took divergent views of what the contract meant"). Defendants were not mistaken as to facts underlying the contract; rather, they were allegedly mistaken as to what the contract said. Therefore, defendants cannot raise any genuine issue of material fact regarding a mutual mistake of fact, and plaintiff is entitled to summary judgment on defendants' third affirmative defense.

Defendants also assert that the interest payments they made to plaintiff – and that plaintiff rejected – should bar or reduce plaintiff's recovery under the theories set-off or offset and recoupment. "Setoff," as defendants use the term here, is more properly designated as a permissive counterclaim under Fed. R. Civ. P. 13(b). *Coplay Cement Co., Inc. v. Willis & Paul Group*, 983 F.2d 1435, 1440 (7th Cir. 1996). This is because setoff is a cause of action that arises out of a different transaction or occurrence than that underlying the plaintiff's suit. *Id.*

1441. Recoupment, by contrast, is considered a compulsory counterclaim arising from the same transaction or occurrence as the underlying suit. *Id.* at 1440.

Regardless of the propriety of defendants' pleading setoff and recoupment as affirmative defenses rather than counterclaims, defendants' argument is unpersuasive. Defendants do not contest that plaintiff has performed its obligations under the contracts, or that plaintiff has the present right to demand full payment of the $15.5 million plus interest. Pursuant to the Credit Agreement, plaintiff could accelerate the full amount of the indebtedness. Therefore, plaintiff was entitled to accept only payment in full, and rejection of defendants' partial interest payments does not entitle defendants to a setoff or recoupment. *See Crown Life Ins. Co. v. American Nat'l Bank & Trust Co. of Chicago*, No. 96 C 917, 1996 WL 432399, at *3 (N.D. Ill. 1996) (finding that partial payment is insufficient to reinstate a mortgage under the Illinois Mortgage Foreclosure Law). Because plaintiff had the right to reject defendants' partial payments, plaintiff is entitled to summary judgment on defendants' eighth and ninth affirmative defenses.

Finally, defendants argue that a genuine issue of material fact exists as to the calculation of interest performed by plaintiff. While defendants present this argument as an affirmative defense, it does not affect their liability on the loan. Thus, it does not fit in the accepted definition of "affirmative defense." *See Bobbitt v. Victorian House, Inc.*, 532 F. Supp. 734, 736 (N.D. Ill. 1982) ("an affirmative defense [is] something that generally admits the matters in a complaint but suggests some other reason why there is no right of recovery"); 5 Charles Alan Wright & Arthur R. Miller, <u>Federal Practice and Procedure</u> § 1270 (3d ed. 1999) ("An affirmative defense will defeat the plaintiff's claim if it is accepted by the district court or the jury").

Defendants' argument, even if correct, would thus not impact plaintiff's right to collect the loan. Rather, defendants contend that Hershey expressed interest in exercising Acadia's option to have interest calculated at the LIBOR rate, and asked for quotes for a one- and two-year calculation of interest at that rate. Defendants contend that Hershey later spoke with a Harris representative over the phone and stated he did not want the LIBOR rate applied for one year. Further, defendants state that an employee of plaintiff applied the LIBOR rate for one year rather than six months, which is what Hershey claims he requested in an email that neither party can locate. Therefore, according to defendants, a genuine issue of material fact exists as to the interest calculation.

The court agrees with defendants' assertion. The Credit Agreement provides that Acadia could exercise its right to create a LIBOR portion by notifying plaintiff, orally or in writing, three days in advance. Thus, defendants' assertions that Hershey phoned Harris and requested that the LIBOR portion not be created for one year, and that Hershey emailed Harris asking for a six-month LIBOR portion, appear to raise a question of fact as to the exercise of Acadia's option.

Further, the Forbearance Agreement between plaintiff and defendants explicitly references the outstanding dispute over the proper interest rate by preserving defendants' right to contest the length of the LIBOR rate's application. Moreover, plaintiff offered to accept defendants' tendered interest payments if they would forgo their rights to pursue the interest dispute. This offer recognizes the existence of a dispute between these parties about the duration of the LIBOR rate. Defendants have properly submitted an affidavit from Hershey stating that plaintiff's representative told him that the LIBOR rate would apply for only six months. Plaintiff

contends that no such communication ever occurred. Hence, a genuine issue of material fact exists as to the proper rate of interest that should be applied for this period.

## **CONCLUSION**

As stated above, the court finds that no genuine issue of material fact exists as to Count I and Count II of plaintiff's complaint, and grants summary judgment to plaintiff as to the issue of defendants' liability for the principal amount of $15.5 million. This matter is set for a status hearing November 30, 2010 at 9:00 a.m. to set a procedure for determining the appropriate interest rate about which the court has found there to be a genuine issue of disputed fact.

**ENTER:** November 16, 2010

_____
**Robert W. Gettleman**
**United States District Judge**