IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| HARRIS N.A., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No.  09 C 6661 |
| vs. | ) | |
| | ) | Magistrate Judge Schenkier |
| ACADIA INVESTMENTS L.C., *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

This lawsuit involves an action by plaintiff, Harris N.A. ("Harris"), for judgment on a $15.5 million note. Count I of the complaint alleges that defendant Acadia Investments L.C. ("Acadia") defaulted on the note; Count II alleges that the individual defendant, Loren W. Hershey, breached a personal guaranty to make good on that indebtedness if Acadia defaulted.

In an order entered on February 8, 2011, the Court entered final judgment against both defendants in the amount of $15.5 million for the default of payments due under the note, and an additional $978,821.81 in prejudgment interest through February 4, 2011 (doc. # 72), for a total award of $6,478,821.81. Both defendants timely filed a notice of appeal from the judgment (doc. # 87); that appeal remains pending in the Seventh Circuit Court of Appeals.

Presently before the Court is a motion by Harris for an award of attorneys' fees and costs (doc. # 163). The motion is directed solely at Mr. Hershey, as proceedings in this Court against Acadia have been stayed as a result of Acadia filing a voluntary petition for bankruptcy on April 7, 2011 (doc. # 119). The request for attorneys' fees is based on the provision in the guaranty signed by Mr. Hershey that he personally would be responsible to pay Harris the amounts due if Acadia

defaulted on the note, including court costs and reasonable attorneys' fees. In its motion, Harris

seeks $541,238.50 in attorneys' fees and $72,538.75 in costs, for a total of $613,777.25, for work

performed during three distinct time periods: (1) for the period prior to suit, in negotiating, drafting

and executing the forbearance agreement after Acadia initially defaulted and prior to the

commencement of litigation in September 2009; (2) for the litigation of this case through the entry

of final judgment in February 2011; and (3) for subsequent work done in the Seventh Circuit to

uphold the judgment, in the bankruptcy court to protect its interest in recovery from assets of the

bankrupt Acadia estate, and in pursuing collection of the judgment against Mr. Hershey personally.

Mr. Hershey opposes this request. He does not dispute that Harris, because it obtained a

judgment, is entitled to an award of attorneys' fees and costs under the contract documents. Rather,

Mr. Hershey argues that the amount of the attorneys' fees and costs that Harris seeks is unreasonable.

Mr. Hershey argues that Harris should be awarded fees and costs totaling no more than $188,028.25

(doc. # 167: Def.'s Resp. at 12).

The matter has now been fully briefed (Harris waived its right to file a reply memorandum

in support of its motion (doc. # 168)). For the reasons that follow, the Court awards Harris

attorneys' fees and costs in the amount of $582,022.63.

## I.

There is no dispute that Harris, which successfully obtained a judgment on both the note and

the guaranty, is contractually entitled to recover its reasonable attorneys' fees and costs. The parties

also appear to agree that the standards for awarding attorneys' fees to a prevailing party under 42

U.S.C. § 1988 should apply here to the question of what reasonable fees should be awarded under

the contracts: both parties cite cases under that statute with respect to the issue of awarding

reasonable attorneys' fees, and they do not suggest that any other law should apply. Accordingly, we consider Harris's request for attorneys' fees under the well-developed standards for awarding attorneys' fees under Section 1988.

In determining what attorneys' fees are reasonable to award, our starting point is the "lodestar approach," which "forms the 'centerpiece' of attorneys' fee determinations, . . ." *Pickett v. Sheridan Healthcare Ctr.*, 664 F.3d 632, 639 (7th Cir. 2011). The lodestar approach requires a court considering a fee petition to multiply (1) the number of hours reasonably expended by the plaintiff's attorneys (2) by their reasonable hourly rates. *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983); *People Who Care v. Rockford Bd. of Educ.*, 90 F.3d 1307, 1310 (7th Cir. 1996). A trial court's determination of a reasonable fee award to the prevailing party is reviewed under the "highly deferential abuse of discretion standard." *Pickett*, 664 F.3d at 639.

As noted above, Harris seeks an award of attorneys' fees and costs for three distinct periods of time in connection with its dispute with Acadia and Mr. Hershey. In his opposition, Mr. Hershey divides the time periods for the fees Harris seeks differently, into five separate (albeit somewhat overlapping) groups: (1) the period from February 9, 2009 to May 21, 2010, for services rendered in what both Harris and Mr. Hershey refer to as "Matter No. 1679539" (Pl.'s Mem. at 5-6; Def.'s Resp. at 12), which accounts for $19,747.00 in fees; (2) the period from September 21, 2009 through April 7, 2011, which Mr. Hershey refers to as "Chart I" (Def.'s Resp. at 5), which accounts for $207,474.60 in fees; (3) the period from April 7, 2011 through September 15, 2011, a period which Mr. Hershey labels as "Chart II" (*Id.* at 8), which accounts for $123,259.00 in fees; (4) the period from August 3, 2011 to October 25, 2011, which Mr. Hershey labels as "Chart III" (*Id.* at 9), which accounts for $22,299.50 in fees; and (5) the time period from September 15, 2011 to February 1,

3

2012, which Mr. Hershey labels as "Chart IV" (*Id.*), which accounts for $160,976.50 in fees. We address each of these time periods below.[1]

## II.

Harris seeks recovery of $19,747.00 in attorneys' fees and $14.88 in costs for work performed by attorneys at the law firm of Chapman & Cutler LLP during the period February 9, 2009 through May 21, 2010 (Pl.'s Mot. at 5). Harris describes those fees and costs as resulting from the default by Acadia of the credit agreement starting in February 2009, which led to the negotiation, drafting, and execution of various subsequent agreements between Harris, Acadia and Hershey prior to the commencement of litigation (*Id.* at 6). In his response, Mr. Hershey concedes that those attorneys' fees and costs are reasonable (Def.'s Resp. at 12 and n.8). We therefore grant Harris's motion to award the full amount of attorneys' fees and costs requested for the services rendered during this time period.

## III.

As explained in Mr. Hershey's response, the Chart I grouping covers services for work done by Harris's attorneys during the period September 21, 2009 through April 7, 2011 (Def.'s Resp. at 5). That work involved: preparing for the filing of this lawsuit; conducting discovery; participating in extensive mediation and negotiations, some of which involved sessions with the Court; filing the summary judgment motion that led to the entry of judgment, as well as subsequent proceedings to establish the rate and amount of prejudgment interest; and proceedings after the entry of judgment

---

[1] We note that the sum of these fees as Mr. Hershey allocates them during his five time periods totals $533,756.10 – somewhat less than the $541,238.50 in fees Harris seeks. In light of our ruling on Mr. Hershey's objections, we have no need to sort through this unexplained discrepancy.

to the filing of the voluntary bankruptcy proceeding by Acadia on April 7, 2011 (*Id.*). Mr. Hershey calculates that Harris seeks $207,474.60 in fees for this time period. Further, by Mr. Hershey's calculation, during this time period Harris's attorneys devoted 366.68 hours to the case, with almost all of that time – 339.38 hours – billed Harris's lead counsel, Mr. Audley. Mr. Hershey asks this Court to reduce plaintiff's fees for this time period to $160,792.34 (*Id.*).

Mr. Hershey does not claim that Mr. Audley and other Harris attorneys did not work the amount of time that they billed for their services; nor does Mr. Hershey argue that Harris's attorneys performed an excessive amount of work during this time period. Thus, Mr. Hershey does not argue that the number of attorney hours used in Harris's lodestar analysis for the Chart I services should be reduced.

Rather, Mr. Hershey's sole challenge is to the rate Harris's attorneys charged for the services. This challenge is two-fold: (1) Mr. Hershey claims that Mr. Audley's average hourly rate (which ranged from $560.00 to $650.00 per hour during the time period covered by Chart I) was too high; and (2) he claims that Mr. Audley should have used less senior attorneys, with lower billing rates, to do more of the work (Def.'s Resp. at 5-6). We do not find either argument persuasive.

*First*, the Seventh Circuit has defined a reasonable hourly rate as one that is "derived from the market rate for the services rendered." *Pickett*, 664 F.3d at 640 (quoting *Denius v. Dunlap*, 330 F.3d 919, 930 (7th Cir. 2003)). The rate that an attorney actually charges – and receives from – paying clients for similar litigation is "presumptively appropriate" to use as the hourly rate for the lodestar analysis. *People Who Care*, 90 F.3d at 1310 (quoting *Gusman v. Unisys Corp.*, 986 F.2d 1146, 1150

(7th Cir. 1993)); *see also Pickett*, 664 F.3d at 640. In this case, Harris has submitted a declaration establishing that the hourly rates charged by Mr. Audley and its other attorneys are the rates that the attorneys from Mr. Audley's firm (Chapman & Cutler LLP) typically charge paying clients – including Harris – for the types of services rendered in this case, and that those are the rates for the services rendered to Harris that Harris "has paid or become obligated to pay" to Chapman & Cutler for its representation in this case (Pl.'s Mot., Ex. 1: Audley Decl. at ¶¶ 4-6).

The sole evidence offered by Mr. Hershey to challenge the reasonableness of Mr. Audley's rate is that Mr. Audley's hourly rate is significantly higher than the rate charged by one of Mr. Hershey's attorneys, Thomas J. Verticchio (Def.'s Resp. at 5 and Ex. 2 at ¶ 7). That argument fails on a number of scores.

To begin with, the guaranty agreement requires Mr. Hershey to pay "reasonable" attorneys' fees; it does not define "reasonable" fees as those fees based on the lowest possible hourly rate. In any event, evidence that one attorney charges a lower rate than another attorney does not make the higher rate "unreasonable." Billing structures vary from firm to firm and from client to client. Without more, the mere fact that Mr. Verticchio charges a lower hourly rate than Mr. Audley does not establish that Mr. Audley's rate is unreasonable, that Mr. Audley's firm does not actually charge Harris this rate, or that Harris does not actually pay for Mr. Audley's services.

Moreover, while Mr. Hershey cites the hourly rate charged by Mr. Verticchio, Mr. Verticchio was only one of several attorneys who has represented Mr. Hershey and Acadia in this matter. From the time that defendants first appeared in the case in January 2010, through February 22, 2011, when he withdrew after the entry of judgment, William John Barrett represented Mr. Hershey and Acadia. Defendants also were represented by lawyers from Venable LLP in Baltimore and Washington, D.C.,

from January 2010 until they withdrew on April 7, 2011. Surely, Mr. Hershey knows what rates these attorneys charged for their services. Yet, Mr. Hershey's response does not disclose what hourly rates were charged by those attorneys, or how their rates compared to those charged by Mr. Audley – or why Mr. Hershey chose not to disclose that information. Thus, even if the fact that other attorneys charged less than Mr. Audley was decisive (which it is not), the evidentiary record submitted by Mr. Hershey is insufficient for us to draw the conclusion that Mr. Audley's rate is in fact significantly higher than the rate of other comparable attorneys in the market.

*Second*, as for Mr. Hershey's argument that Mr. Audley should have delegated more work to attorneys with lower billing rates, again Mr. Hershey presents an incomplete evidentiary record. For example, we do not know how much work Mr. Barrett delegated to other attorneys, what their billing rates were, and the resulting composite billing rate. What is more, Mr. Hershey's argument presumes that using attorneys with lower billing rates would have resulted in a lower overall charge. However, the attorneys with lower billing rates at Mr. Audley's firm would likely have less experience than Mr. Audley. One might argue that Mr. Audley's higher billing rate results from him being more experienced, and that as a result of being more experienced he is more efficient and thus spent less time doing certain tasks than less experienced attorneys who had lower billing rates would have spent. *See, e.g., Gusman*, 986 F.2d at 1150 ("A $225 per hour lawyer may end up costing less than a $150 lawyer for the same result or may produce better results for this same total bill").

Mr. Hershey has not provided any evidence to support the presumption he asks us to make. He has not identified specific tasks that should have been delegated, or offered evidence that those tasks could have been performed without an increase in the expenditure of time that would have offset the lower billing rate of less experienced attorneys. Rather, Mr. Hershey takes the approach that the

7

billing rates for Mr. Audley and the other attorneys who billed time during the Chart I period should be reduced by 22.5 percent "as the more reasonable assertible market rate for litigators of equivalent skill and experience," and then should be reduced another 10 percent to reflect the "'market rate' for a blended fee approach to ascertaining the 'reasonable' fees to be awarded by this Court" (Def.'s Resp. at 6). We decline to adopt that meat-axe approach to considering a fee petition.

## IV.

We treat together Mr. Hershey's objections to the request for fees in connection with what he has labeled as the Chart II, III and IV groupings, because Mr. Hershey's attack on Harris's request for fees in connection with each of those groupings is the same. According to Mr. Hershey, Harris seeks a total of $306,535.00 for these time periods. Mr. Hershey, however, contends that Harris should recover nothing for the work its attorneys performed for the time period covered by those groupings, because the work was performed after the entry of judgment and Acadia's filing of a voluntary bankruptcy.

Mr. Hershey's basic argument is that Harris should not have vigorously pursued efforts to collect on the judgment against him personally, but rather should have negotiated a resolution. The resolution Mr. Hershey had in mind (at least as expressed in his response) would have allowed Harris to recover some of the funds from Mr. Hershey personally, but would have required Harris to look to recovery from the bankrupt estate for the lion's share of any recovery. According to Mr. Hershey, his post-judgment proposals to settle were reasonable; Harris's refusal to accede to his settlement proposals was unreasonable; and, therefore, all of the time that Harris spent seeking to recover its judgment was unreasonable and should not be charged to Mr. Hershey. For a number of reasons, this argument fails.

8

*First*, Harris had no legal obligation to settle the matter with Mr. Hershey, or to let him off the hook on the guaranty and to look instead to recovery from the Acadia bankruptcy estate to satisfy the judgment. The guaranty agreement that Mr. Hershey signed made this crystal clear. On the preprinted page directly beneath Mr. Hershey's signature, the guaranty states, in relevant part, *"the bank can collect this debt from you without first trying to collect from the borrower"* (Pl.'s Mot., Ex. 7) (emphasis in original). Indeed, the whole point of the guaranty agreement was to give Harris assurance that if there was a default, it would not have to look simply to the credit of Acadia to obtain recovery. Instead, Harris would have a separate source of recovery that it could pursue in tandem with – or instead of – Acadia. We expect that Mr. Hershey, who is an attorney, was fully aware that this was the bargain he made. He cannot now complain that Harris is pursuing the right it secured by obtaining the guaranty from Mr. Hershey: to seek to recover the judgment (or as much of it as possible) from Mr. Hershey, and not rely simply on what Harris might recover in the bankruptcy.

*Second*, an underlying premise of Mr. Hershey's argument is that his settlement overtures were so reasonable that Harris must have been acting unreasonably in declining them. The evidence that Mr. Hershey has offered fails to establish that premise.

Mr. Hershey points to a settlement offer that he made by way of a letter dated August 25, 2011 (Def.'s Resp., Ex. 3), which Mr. Hershey claims Harris should have accepted rather than pursue its efforts to enforce and collect on the judgment (Def.'s Resp. at 8-9). Under that proposal, Mr. Hershey would have agreed to pay $3 million, over a two and one-half year period, with Harris's sole recourse for the remaining $13.5 million on the judgment being whatever could be recovered from Acadia in bankruptcy. We cannot say that Mr. Hershey's offer was so patently reasonable that Harris was

9

unreasonable in declining it, or that by declining it Harris should be barred from recovering attorneys' fees for the time it spent in pursuing efforts to collect from Mr. Hershey.

Mr. Hershey also points to a proposal that he says he authorized his New York counsel to make to Harris in January 2012 (Def.'s Resp. at 10 n.7 and Ex. 2 (Hershey Decl.) ¶ 9). The details of that proposal are sparse, and the declaration states only that Mr. Hershey authorized his attorney to make the proposal – it does not attest to the fact that the proposal actually was made. In any event, as described in the declaration, the proposal again would have required Harris to limit its recovery from Mr. Hershey (this time to $3.5 million), and to leave the bankrupt Acadia estate as the only remaining source of recovery for a $13 million balance on the judgment. Moreover, while Mr. Hershey describes his proposal as one that would have involved "help[ing] fund a Plan of Reorganization in the Bankruptcy Court to permit Harris to be repaid 100% of its principal of $15.5 million at a to-be-set interest rate over 3-4 years" (*Id.*, Ex. 2 at ¶ 9), there is no indication that Mr. Hershey's proposal to limit his own liability on the guaranty was contingent on the bankruptcy court approving a plan that would allow for Harris to obtain full recovery of the balance. Again, we cannot say that Harris acted so unreasonably that it is entitled to no recovery of fees, merely because it chose to preserve its contractual right under the guaranty to seek recovery from Mr. Hershey and to decline his efforts to persuade Harris to substitute the credit of a bankrupt entity for that of Mr. Hershey.

The remainder of Mr. Hershey's arguments do little more than reiterate the mantra that Harris should have settled the case rather than pursue recovery against Mr. Hershey, and speculate that Harris's decision to do otherwise reflects some inbred animus against Mr. Hershey personally. These arguments do not persuade us that Harris was obliged to forego its contractual right to pursue recovery

against Mr. Hershey and to accept Mr. Hershey's efforts to cap the amount Harris could recover from him under the guaranty. We conclude that Harris's exercise of its contractual right under the guaranty to seek recovery from Mr. Hershey on the judgment in no way bars it from recovering reasonable attorneys' fees for that effort, as expressly permitted by the guaranty agreement that Mr. Hershey signed.

Mr. Hershey offers no other argument to challenge the specific amounts of time devoted by Harris's attorneys to collection and related efforts during the Chart II-IV time periods. We note that in the Rule 54.3(d) joint statement that preceded the filing of the motion (Pl.'s Mot., Ex. 5), Mr. Hershey challenged 181 specific entries of time by Mr. Audley and other attorneys: some pre-dating the Charts II-IV time period, and some occurring during those time periods (*Id.*, Ex. 2). However, in his response to the fee petition, Mr. Hershey does not discuss any of those specific entries of time. He does not explain why any particular work reflected in a time entry should not have been performed at all, or assuming it should have been performed, why the amount of time billed was excessive for the task performed. Mr. Hershey nonetheless asks the Court "to make explicit the basis for its findings as to reasonable hours expended" (Def.'s Resp. at 12 and n.9). However, the Court will not do so in a vacuum. It is Mr. Hershey's responsibility, not the Court's, to explain the specific reasons for challenges to any particular time entries. In the absence of a principled basis to reduce allegedly excessive entries, this Court will not "engage in arbitrary determination of how long a 'reasonable' attorney would spend" on given tasks. *O'Sullivan v. City of Chicago*, 484 F. Supp. 2d 829, 837 (N.D. Ill. 2007).

Moreover, any challenge that Mr. Hershey might hope to might to specific time entries would start off on weak ground because he has not disclosed how much time his attorneys spent on any

particular tasks. Local Rule 54.3(d)(5)(A) requires that, if a defendant questions the number of hours spent by a plaintiff's attorney, then the defendant must disclose "the time and work records . . . of respondent's counsel pertaining to the litigation, which records may be redacted to prevent disclosure of material protected by the attorney-client or work product doctrine." L.R. 54.3(d)(5)(A). The purpose of this rule is to prevent a responding attorney from criticizing the number of hours devoted to the case by counsel for the prevailing party, without having to disclose how many hours the responding attorney spent on the case. *See Farfaras v. Citizens Bank & Trust of Chicago*, 433 F.3d 558, 569 (7th Cir. 2006) ("the letter and spirit of Local Rule 54.3" is to require a party opposing a fee request to present its own attorneys' billing records, in order to avoid "hypocritical objections").

We recognize that Harris's attorneys have spent a substantial amount of time on post-judgment activities. However, we consider the context in which those time expenditures occurred. The post-judgment activities handled by Harris's attorneys have included: proceedings on appeal concerning whether the appeal should be stayed as to Mr. Hershey given the Acadia bankruptcy, and mediation efforts; proceedings in the bankruptcy court to protect Harris's interest in obtaining recovery of as much as possible from the Acadia estate; and proceedings in the district court to register the judgment and collect on it from Mr. Hershey. Moreover, we have observed that every matter in this case, large and small alike, has been vigorously contested by Mr. Hershey. It is, of course, his right to do so. However, when he then complains about the amount of time that Harris's attorneys have spent on these matters, to a great extent Mr. Hershey is complaining about a wound that is self-inflicted.

12

For the foregoing reasons, we reject Mr. Hershey's argument that Harris should recover no fees for the work performed by its attorneys during the Chart II-IV time periods. We award Harris all of its fees sought for these periods.

V.

Finally, we consider Mr. Hershey's challenges to the costs Harris requests. Mr. Hershey challenges the $56,442.96 in costs that Harris seeks to recover for the time periods covered by Charts I and II, through September 15, 2011. Mr. Hershey argues that the $56,442.96 of asserted costs should be reduced by fifty percent, to $28,221.48 (Def.'s Resp. at 6). Mr. Hershey argues that this reduction is warranted because: the case involved only limited discovery that was conducted in 30 days, with the case being resolved on summary judgment; some of the costs were incurred by post-judgment efforts by Harris that Mr. Hershey says could have been avoided had Harris accepted his settlement proposals; and charges for Westlaw research should not be reimbursed because "there is no way to determine if [they are] reasonably priced" (*Id.*).

For the reasons that we have already described, we will not reduce or eliminate reimbursement for costs that Harris incurred because it chose to engage in efforts to enforce and collect upon the judgment rather accept Mr. Hershey's settlement overtures. Moreover, Mr. Hershey's argument that the costs were excessive because discovery was limited and the case resolved on summary judgment does not provide sufficient specificity for the Court to determine any particular costs incurred that were unwarranted or excessive.

Mr. Hershey's challenge to the Westlaw charges, however, stands on a different footing. The cost of computerized legal research is compensable as part of any attorneys' fees award. *Haroco, Inc. v. Amer. Nat'l Bank and Trust Co.*, 38 F.3d 1429, 1440 (7th Cir. 1994); *Davis v. Budz*, 99 C 3009,

13

2011 WL 1303477, at *8 (N.D. Ill. Mar, 31, 2011). "[A] party seeking recovery for such expenses must provide information from which the court may determine whether the computerized legal research charges were reasonably incurred." *Davis*, 2011 WL 1303477, at *8 (internal quotations omitted); *see also Riddle v. Nat'l Sec. Agency, Inc.*, 05 C 5880, 2010 WL 1655443, at *9 (N.D. Ill. Apr. 23, 2010).

Harris has provided evidence that its attorneys incurred charges for computerized research, and that Harris has been (or will be) billed for those charges. But, Harris has failed to offer evidence that would allow us to determine whether those charges were reasonable. We do not know the way that Harris's attorneys charge for computerized research (*e.g.*, do they merely pass on their costs to Harris, or is there a markup, and, if so, is that standard in the market?). And, Harris does not identify the nature or subject of the research. To the extent Harris suggests that we could obtain information from the attorney billing records, Harris seeks to delegate its burden of proof to the Court. We decline to accept that delegation: a court "is not obligated to comb through the [law firm's] attorney time records in an attempt to match the computerized legal research charges to the research topics therein described." *Davis*, 2011 WL 1303477, at *8 (quoting *Newsome v. McCabe*, No. 96 C 7680, 2002 WL 1008472, at *9 n.33 (N.D. Ill. May 17, 2002)).

We therefore decline to award plaintiff any of the costs for computerized research. By our calculations, that results in a reduction of $31,754.62 in the costs sought. We thus will award costs for the Charts I-II periods in the amount of $24,688.34 ($56,442.96 - $31,754.62). Mr. Hershey has not addressed costs for the Chart III-IV periods, and thus (except for computerized legal research costs, which we have included in the above calculation), we do not make any reduction in the costs incurred during these periods.

## CONCLUSION

For the foregoing reasons, we grant Harris's petition for attorneys' fees and costs (doc. # 163), in the amount of $582,022.63 (reflecting a reduction of $31,754.62 from the $613,777.25 in attorneys' fees and costs sought by Harris).

ENTER:

SIDNEY I. SCHENKIER
United States Magistrate Judge

Dated: May 14, 2012

15